UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------X

UNITED STATES OF AMERICA,                Case No.: 22-Cr-00375

    -v.-                                Memorandum in Aid of Sentencing

AARON EGELMAN,

                   Defendant.
-------------------------------------------------X

Defendant, Aaron Egelman, by his attorneys, respectfully submits the within memorandum in aid of sentencing pursuant to U.S.S.G. §6A1.2-3 and the Fed. R. Crim. P. Rule 32, and hereby states as follows:

## I.    __Introduction__

On December 12, 2023, Mr. Egelman, appeared before this Honorable Court and accepted responsibility by pleading guilty to possessing material containing minors engaging in sexually explicit material in violation of 18 U.S.C. §§ 2252(a)(4)(B), 2252(b)(2) and 3551 et seq.). He is scheduled to be sentenced on July 29, 2024.

## II.    __Plea Agreement/Probation Report's Concurrence With The Position Of The Parties In The Plea Agreement__

The parties entered into a plea agreement and have stipulated to a total offense level of 34 under the applicable Sentencing Guidelines, and have jointly agreed that the Court, if so inclined, should sentence the Mr. Egelman to a total of three years of incarceration (36 months). The Probation Department's Investigation Report engaged in an extensive and thorough review of Mr. Egelman's history and background.

The Probation Department's Sentence Recommendation concurs with the parties, finding the sentence of three years' incarceration to be "sufficient, but not greater than necessary, to comply with the sentencing factors set forth in 18 U.S.C. § 3553(a)"; and the Probation Department further recommends a five-year term of

Supervised Release "and should include the selected special conditions as they are necessary to ensure not only the continued rehabilitation of the defendant, but also to adequately address concerns for societal safety."

Further, in accordance with Section V hereinbelow, it is requested that Mr. Egelman be permitted to self-surrender, at his own cost, to FCI Elkton, located in Lisbon, Ohio, due to the various programs and treatment options specific to the offense at issue.

### III.   Character Letters/Additional Information/Recent Updates

As counsel for Mr. Egelman, enclosed are 29 character letters that have been received from family, friends and colleagues who know him well.  As counsel, we did not edit the letters nor make suggestions as we believe that the individuals who know Mr. Egelman best should describe him to the Court in their words, not ours. These letters are important because they shed light on who Mr. Egelman is as a person, and support the proposed sentence.  In addition, these letters will address the Court's concerns about adequate deterrence and potential future crimes.

Attached are letters from the following family and friends:

- Jesse Baco, Esq.
- Dr. Eric Egelman
- Mark Kletter
- Matthew Lissauer
- Linda Rasero
- Janis & Marc Schimsky
- Dr. Glenn Egelman
- Millicent & Stephen Reich
- Dr. Seth Wellins
- Connie Egelman (*Defendant's mother*)
- Joseph Provetto
- Pamela Provetto
- Dr. Catherine Stratton
- Rabbi Judith Cohen-Rosenberg
- Steve Egelman
- Christian Pokorney
- William Egelman (*Defendant's father*)

2

- Jacqueline Egelman
- Dr. Mark Brody
- Felicia Egelman
- Scott Perrell
- John Cunneen
- Dr. Paul Greene
- Linda Devito
- Jeremy Egelman
- Elizabeth May, LCSW (*Defendant's mental health counselor who submits monthly reports to the Probation Department*)
- Dino Tsaousis
- William Kazer
- Wei Egelman (*Defendant's wife*; which contains a photo of "All About My Dad" from Defendant's 4 year old son)

We would ask the Court to focus not only on the sheer breadth of these letters, as they come from numerous members of society across the country in all walks of life, but also from the content, not because of any attempt to mitigate the crime by which Mr. Egelman stands convicted of, but in an effort to humanize Mr. Egelman and provide the Court with the realistic perspective of Mr. Egelman – who has not only taken responsibility for his behavior – but also of those around him who will suffer greatly as a result.

We ask the Court to take particular note of certain letters.

In the letter submitted by Mr. Egelman's father, William Egelman, he points out, quite articulately, how the past 23 months of Mr. Egelman's home detention in his parents' home (and not his own home) has caused him severe detriment, being unable to take a walk around the block, teach his four-year hold son how to ride a bicycle, go out for a meal with family and also caused him to miss his brother's recent wedding. He explains how this has caused Mr. Egelman to be unable to enjoy the usual incidents of parenthood and family life despite being "incarcerated at home". He acknowledges his bias as a father but yet persuasively begs the Court to "temper justice with mercy" given the extreme personal suffering over these last 23 months. The letter submitted by Mr. Egelman's mother, Connie Egelman, echoes this sentiment and outlines the positive strides that Mr. Egelman has made over the past two years, as well as point out the many specific and repeated instances of merciful and caring behavior of Mr. Egelman since childhood.

3

In the letter submitted by Mr. Egelman's assigned therapist, Elizabeth May, LCSW, who submits monthly reports to the Probation Department, it is discussed how Mr. Egelman remains committed to his treatment, and to the progress he has made, along with his relationship, bonding and family support.  That she is not his personal therapist, but one assigned by Pre-Trial Services as part of his monitoring, speaks volumes to show his remorse as it is obvious that Ms. May, a trained professional, would not hold back if she believed Mr. Egelman had not been fulfilling his obligations.  Her letter therefore carries an even greater significance as it is neutral and an unbiased professional opinion.

In the letter submitted by Mr. Egelman's wife, Wei Egelman, it is tearfully related to the Court, very explicitly, how Mr. Egelman's actions have derailed her life, as well as the lives of Mr. Egelman and their young blameless son, but then focuses on the continued, extensive and unrelentless positive contributions to society that Mr. Egelman has made both before and after his arrest.  But it is her words at the end of the letter that are perhaps the most persuasive of all:

> Aaron Egelman is flawed. But other than this instance, from fifteen years of knowing him, I find him to be consistent in doing good and being kind. *It is my assessment that having him in my son's life is still more beneficial to my son than otherwise. This is why I continue to associate with him despite the negative impact of his conviction on our lives.* I hope you will consider our support of him in the sentencing.

This utterly frank but understandably realistic reference to the reason that Mr. Egelman's wife continues to have him in her life is as a result of their blameless four-year old child.

These letters, and the thoughtful and insightful sentiments expressed, respectfully support the proposed sentence.

The Court should also be aware of certain recent facts that would not be otherwise known.  While the Court may be aware that Mr. Egelman has been **steadily employed** since shortly after his arrest, and therefore a productive member of society, Mr. Egelman was recently terminated from his job as a result of the upcoming sentencing.

4

The Court should additionally be aware that Mr. Egelman's mother (Connie Egelman) was recently diagnosed with cancer and is beginning treatment.

## IV.   Mr. Egelman's History and Background

Aaron Egelman (DOB 07/25/1981), is a 42-year-old man (he will be 43 at the time of sentence on July 29, 2024) who was born in Nassau County, New York. His father was a college professor and his mother a Counselor. He has a younger brother who is a New York City teacher. Mr. Egelman continues to live with his parents until this matter can be resolved. His wife and their 4 year old son reside together nearby.

During grammar school years, Mr. Egelman attended Bowling Green Elementary School. He then went on to attend Clark Middle and High School, graduating in 1999 with a High School degree. Thereafter, he attended Towson University before transferring to SUNY Purchase, where he obtained a Bachelor's Degree.

As a teenager, Mr. Egelman worked at Computer USA and while in High School, worked at Data Vision. While in college, Mr. Egelman battled depression which may have been the underlying reason for his poor performance at Towson University. As a coping mechanism, he smoked marijuana 3-4 times per day. In between colleges, he worked at a couple of technology companies, and then after graduating college, he worked with Win Holt Equipment Manufacturing as a Systems Administrator. Mr. Egelman was gainfully employed in the IT field continuously since college and, at the time of his arrest, Mr. Egelman was working as an IT Director/Coordinator for The Tiegerman School located in Glen Cove. Although he was terminated from that employment as a result of the arrest, shortly after his release upon arraignment, Mr. Egelman obtained employment with the Lloyd Group in the IT field and was promoted several times most recently obtaining the position as Team Leader (until his recent termination as a result of the upcoming sentencing).

Mr. Egelman's history with respect to community service has been long-standing. As indicated by the Probation Department, and as noted by the many letters in support of Mr. Egelman, he has dedicated a significant portion of his life to helping those in need in a multitude of contexts. Just to name a few, Mr. Egelman's endeavors included participation in Model Congress in high school and

in a religious interfaith program known as "Project Understanding".  His service as an unpaid and volunteer co-op board member and president for over four years consumed many hours per week in dealing with numerous issues, including the removal of an unscrupulous building superintendent, the supervision of numerous repair and maintenance projects, saving the parking lot from improper use, and interfacing with community groups, other co-op boards and local government.  His efforts resulted in the co-op having greater transparency, professional direction and financial stability.  Mr. Egelman was quoted several times in NEWSDAY in 2021 with respect to his work in preventing the development of a high-rise building next door to the co-op which would have "radically changed" the neighborhood and negatively affected quality of life and property values (NEWSDAY, *Apartment Proposal Delayed By Village Residents Who Oppose Its Size, Density*, September 12, 2021) (NEWSDAY, *Preservation Commission Says Proposed Apartment Site Meets Landmark Criteria*, November 2, 2021).

Currently, Mr. Egelman is dealing with the stress from his arrest and the impact that it has had on his family, although he did not let it affect his ability to be a contributing member of society as he immediately obtained employment after arraignment and has continued to work full-time despite being subject to home detention.  He is attending individual outpatient mental health therapy and is taking medication (Wellbutrin) for depression.  His therapist, Elizabeth May, LCSW, wrote one of the letters which are being proffered in support of the proposed sentence.

## V.  <u>Self-Surrender and Prison Request:</u>

In accordance with the Bureau of Prisons program Statement 5100.08, Chapter 4, Page 5, we are respectfully requesting that Mr. Egelman be permitted to voluntarily surrender to his place of confinement at his own cost.  In addition, on behalf of Mr. Egelman, we are asking that the Court recommend that he be sent to FCI Elkton, which is located in Lisbon, Ohio.

As counsel, we have had serious discussions with Mr. Egelman about addressing his socially unacceptable interests that made up the subject matter of this action.  He openly recognizes his improper conduct, accepts responsibility and wants help addressing it.  At FCI Elkton, this prison offers the non-residential sex offender treatment program (SOTP-NR), which is designed and geared to treat low to moderate risk sexual offenders.  Many of the inmates in the  SOTP-NR program are first time offenders serving a sentence for internet sex crimes.  The actual program involves outpatient group meetings 2-3 times per week for several hours for a period

6

of 9-12 months. Participants learn basic skills and concepts to help them understand their past offenses and to reduce risk of future offending.

It is firmly believed that placing Mr. Egelman in a facility that has specific resources dedicated to Internet Sex Offender Treatment is not only in the best interest of our client, but also society as a whole. The aim of internet sex offender treatment is to decrease denial and identify and reduce discrepancy between perceived pro-social values and distorted attitudes. Likewise, these programs are designed to challenge offence supportive attitudes and behaviors. In addition, the intervention models focus upon building an empathic response to identifying that children depicted in the indecent material are real victims of child abuse.

In addition, these programs are also designed to reduce the use of sex as a coping strategy and emotional avoidance by replacing it with effective problem solving technics. Furthermore, the programs seeks to develop adequate relationship, intimacy and coping skills for the sexual offender. This also includes improving the offender's self-esteem and internal locus of control and self-management. Finally, these programs are geared towards developing realistic relapse prevention strategies and new pro-social lifestyle goals. It is the obvious hope – expressly shared by Mr. Egelman – that upon his release, he will go back to being a productive member of society and have *already been on a path* to seamless transition from in-custody treatment and services to that of treatment and services outside of custody, thereby ensuring it will continue unabated and without interruption and have the most chance of success and upward development.

As the Court fully knows, an 'internet-only' offender is someone whose sexual offending is confined to the possession, downloading, making and/or distribution of indecent images of children. In general, this group has a low rate of re-conviction for sexual offenses (Seto, Hanson & Babchashin, 2011; Wakeling, Howard & Barnett, 2011). In general, large scale research indicates that sex offenders who receive treatment, in both prison and community settings, have a lower sexual re-conviction rate than those who do not receive treatment. Cognitive behavioral treatment is the most effective, especially if paired with pharmacological treatment (for example hormonal drugs that reduce sexual drive). Other approaches (psychotherapy, counseling and non-behavioral treatment) generally do not reduce re-conviction. Hanson, Bourgon, Helmus, & Hodgson (2009) examined 23 studies that met minimum standards for methodological quality and found an eight percentage point difference (10.9% and 19.2%, respectively, or a relative 43% reduction) between treated offenders and untreated controls in sexual re-conviction.

Sex offender programs which follow the risk, need and responsivity principles lead to the largest reductions in re-conviction.  Medium and high risk sexual offenders benefit most from treatment.

Mr. Egelman has already submitted to counseling and has taken treatment seriously.  In addition to everything already pointed out herein, Mr. Egelman was also evaluated by Dr. Kostas Katsavdakis, PhD., a Diplomate in Forensic Psychology, as part of the pre-trial proceedings, and Dr. Katsavdakis issued a report that was shared with the Government.  Significantly, Dr. Katsavdakis found Mr. Egelman's risk of recidivism to already be very low.  The benefit to Mr. Egelman, and that of society, is to dovetail that with a focused program while incarcerated that would precisely, specifically and intentionally address Mr. Egelman's issues.  Put another way, Mr. Egelman desperately wants to be in an incarceration setting that has a strong focus on treatment, instead of just "being incarcerated" with no aim at rehabilitation.

It is respectfully urged the Court permit Mr. Egelman to self-surrender, at his own cost, to FCI Elkton, due to these programs and treatment options.  Given societal goals at rehabilitation, it is undeniably beneficial not only for Mr. Egelman but for society at large that he be given the best opportunity available to accomplish that especially where, as here, Mr. Egelman has fully accepted responsibility for his actions and wants to continue engaging in treatment to better himself for the good of himself, his family and the community at large.

## VI. Supervised Release Special Conditions Regarding Mr. Egelman's Child And His Ability To Parent His Child And Maintain A Father-Son Relationship

As noted in the probation report to the Court, Mr. Egelman is married and has a young child.  We are requesting that the Court undertake an individualized review on the record of the relationship between Mr. Egelman and his son.  It is counsels' humble opinion that any supervised release restrictions that do not allow Mr. Egelman to freely be around and raise his child would be unreasonable because it infringes upon his indelible right to parent his child.  Since the issue of being able to raise his child may conflict with a Special Condition of supervised release, the Court is further asked to follow the enhanced procedural requirement.  United States v. Wolf, 699 F.3d 1082 (9th Cir. 2012).

8

The fundamental liberty interest in having contact with one's children is equally, if not more, significant. "The substantive due process right to family integrity or to familial association is well established. A parent has a fundamental liberty interest in companionship with his or her child." Rosenbaum v. Washoe Cnty., 663 F.3d 1071, 1079 (9th Cir. 2011) (internal quotation marks and citation omitted). It is perhaps the oldest of the fundamental liberty interests recognized by the Supreme Court. Troxel v. Granville, 530 U.S. 57, 65 (2000). This interest occupies a unique place in our legal culture, given the centrality of family life as the focus for personal meaning and responsibility. Far more precious than property rights, parental rights have been deemed to be among those essential to the orderly pursuit of happiness by free men, and to be more significant and priceless than liberties which derive merely from shifting economic arrangements. Lassiter v. Dep't of Soc. Servs., 452 U.S. 18, 38 (1981).

The existence of a constitutionally protected liberty interest does not render impermissible any condition that would interfere with the parent-child relationship. United States v. Davis, 452 F.3d 991, 995 (8th Cir. 2006). Interference with that right, however, requires a powerful countervailing interest, and strict adherence to procedures is required. Lassiter, 452 U.S. at 27 (internal quotation marks and citation omitted). Moreover, conditions of supervised release must be narrowly tailored to serve a compelling government interest so as to not to unnecessarily deprive a defendant of his liberty. United States v. Pablo Hernandez, 209 F.Supp.3d 542 (E.D.N.Y. 2016).

In this situation, Mr. Egelman has a fundamental right to raise his child. Moreover, the allegations in this case did not exceed mere viewing of Child Sexual Exploitation Material (CSEM). **Furthermore, there is not a shred of evidence that Mr. Egelman acted upon his unacceptable sexual urges with any child, including but not limited to, his own child. That was specifically confirmed by the report issued by the Nassau County Department of Social Services, Child Protective Services.**

Nevertheless, Mr. Egelman's right to parent his own child is not absolute and must be balanced against the interests of the Government. As a compromise, we would suggest to the court that Mr. Egelman be permitted to live with his wife and son with unfettered access to the subject child. However, to meet the Government's concerns, Mr. Egelman would not be able to attend (unless supervised) school events, children's parties, and or be present unsupervised with his son for a play date at his home or any place else, and or go to amusement parks or public parks

unsupervised. Such prohibitions and restrictions should also not prevent Mr. Egelman from watching said school events via streaming or other online live viewing.

## VII.   Supervised Release Special Conditions Regarding Mr. Egelman's Computer Use For Employment

Mr. Egelman has been gainfully employed in the Information Technology (IT) for many years. He has continued to do so since his arrest. Upon release from incarceration, an exception for computer use must respectfully be made with regards to his employment since, if not made, it will effectively prevent him from such employment as no employer will permit a regular governmental intrusion into their system. To be clear, this concerns solely a work computer (as opposed to computer for personal use).

Post-arrest, the Probation Department found an appropriate compromise and allowed Mr. Egelman's work computer to remain monitored by the employer as long as the employer has its own monitoring pursuant to a "computer use" policy. Mr. Egelman provided such "computer use" policy to the Probation Department (which included audit logs of user activities, which are monitored to ensure the appropriate use of computing resources in a manner consistent with all applicable laws, including local, state, federal and foreign laws) and found same wholly acceptable.

We are therefore requesting the Court permit this Special Condition with this same type of compromise.

## VIII.   Level of Culpability

Mr. Egelman has quickly accepted responsibility for his actions. However, as counsel, we believed that he should only be held accountable for his actual conduct, which was "possessing" CSEM videos and photos as opposed to "receiving." Upon researching the legal nuance and distinction, the law in its original enactment was primarily focused upon commercialization of child pornography. While Congress may have attempted to rectify the problem of non-commercial child pornography, it did so with vague and conflicting language. Essentially, a person cannot be guilty of just possessing CSEM because to possess it, one needs to receive it.

We concede that Mr. Egelman possessed the CSEM videos and photos, but at no time did such possession exceed mere viewing in the privacy of his residence.

Furthermore, at no time did Mr. Egelman distribute and or knowingly distribute said material to any other person.  Likewise, at no time did Mr. Egelman surf illicit websites that targeted children or chatted with others in search of child pornography.

### IX.   18 U.S.C. 3553(a) Factors and Request for Sentence Below Guidelines

It is well settled that the Sentencing Guidelines are not mandatory and are merely advisory.  United States v. Booker, 543 U.S. 220 (2005); United States v. Crosby, 397 F.3d 103 (2d Cir. 2005).  A district court should begin all sentencing proceedings by correctly calculating the applicable guidelines range.   The Guidelines are not the only consideration, however.  Accordingly, after giving both parties an opportunity to argue for whatever reasonable sentence they deem appropriate, the district judge should then consider all of the §3553(a) factors to determine whether they support the sentence requested by a party.  Gall v. United States, 552 U.S. 38, 49, 50 (2007).

**18 U.S.C. §3553(a) Factors:**

1.   **The nature and circumstances of the offense and the history and characteristics of the defendant**:

In this case, Mr. Egelman found himself in a dark place when he possessed and viewed child pornography.  There is simply no excuse for him to have allowed himself to fall into this socially unacceptable and deviant sexual behavior.  As counsel, we simply have no argument against possession of CSEM downloads.

Nevertheless, Mr. Egelman is a first time non-violent felony offender.  He fully recognizes that his behavior is criminal, unacceptable, and that the children depicted in these videos and photos are actual victims.  He also now realizes that he should have sought help to address these deviant sexual interests.  As counsel, we have spoken with Mr. Egelman who is committed to addressing his problem by engaging in therapy and counseling.  The pre-trial services report substantiates that Mr. Egelman has been committed to sex offender treatment and counseling.  We do not believe that he has had a single issue with compliance while reporting to pre-trial services.  Respectfully, Mr. Egelman's conduct and respect for the Court and the Probation Department clearly shows that he is willing to abide by the law and the proposed 36 month sentence and post-incarceration supervised release would be sufficient to hold him accountable.

Despite his arrest, Mr. Egelman has also managed to find new employment and sustain that employment without incident.   As counsel, we believe that after he has satisfied his punishment of incarceration, we believe that his skill sets will allow him to re-enter the job market in the IT industry.

Mr. Egelman, stands before the Court at 42 years of age (43 at time of sentence on July 29, 2024) with no prior criminal convictions.   It is completely unlikely that he will return to criminal activity given this experience, his clear remorse and his active attempts to atone for his criminal behavior but at the same time address this deviant sexual attraction.   This is especially so when considering Mr. Egelman's request to be housed at FCI Elkton due to the various programs and treatment options available.

As counsel, I would also point out Mr. Egelman's heartfelt emotions and sensitivity during his plea allocution.   He is a humble and simple person who unfortunately made a mistake and engaged in criminal conduct.   His post-arrest conduct along with his letters of support submitted corroborate his caring nature.

2.      **The need for the sentence imposed –**
**(A)      To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;**

The crime for which Mr. Egelman stands convicted of is a non-violent offense. Nevertheless, he involved himself in conduct that cannot be tolerated as a society. Mr. Egelman, is now convicted of a non-violent felony and it is his first offense. The promotion of respect for the law can be achieved by the proposed sentence by the Government and Defense, which includes a period of incarceration for 3 years, plus supervised release.  Society benefits because the Defense is seeking to have Mr. Egelman serve his sentence at a facility that specifically deals with those convicted of internet sex offense.  Justice is achieved when an offender is held accountable but not crushed and is able to be rehabilitated.  In this case, Mr. Egelman has already begun the process of addressing his desire towards repulsive and unacceptable deviant sexual conduct.  In addition, he has requested of the Court to allow him to self-surrender to a prison located in Ohio that will allow him to get weekly therapy, thereby making his period of incarceration productive as opposed to accomplishing nothing but wasting time.

The punishment suggested, would be just, based upon Mr. Egelman's criminal history as a Category I first time offender. The aforesaid sentence promotes both accountability, but also deterrence to others. It also gives Mr. Egelman a second chance to make amends and show society that he is truly repentant for his crime.

**(B)    To afford adequate deterrence to criminal conduct;**

Deterrence for this offense is paramount and the proposed sentence constitutes deterrence that well-exceeds all boundaries. Put another way, the deterrent effect that comes from the proposed sentence (i.e., incarceration, supervised release with condition) and the unavoidable consequences (i.e., being registered as a sex offender) is indeed significant.

Simply put, if Mr. Egelman were ever to re-offend, his life would effectively be over. Hence our respectful belief that time proposed sentence and subsequent consequences is proper deterrence.

**(C)    To protect the public from further crimes of the defendant; and**

As counsel, we respectfully believe that the chance for recidivism with Mr. Egelman is minimal, at best. He has lived a law abiding life his entire life until he allowed these deviant sexual urges to take over. Given the fact that he has already engaged in therapy, is seeking incarceration at a facility that is dedicated to internet sex crimes inmates, and will be receiving counseling and services upon his release, wholly protects and benefits society. Recidivism increases when a defendant does not get treatment while in prison and does not have that base to work from prior to release.

**(D)    To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;**

As counsel, we are unaware of any educational or vocational training that Mr. Egelman is in need of. Since his arrest, he found new employment and has been steadily working, which is one of the reasons that we believe that he will not re-offend. Nevertheless, we believe that he needs non-residential sex offender treatment. That is why we are specifically requesting that Mr. Egelman be sent to

FCI Elkton located in Ohio because it offers the non-residential sex offender treatment program (SOTP-NR).

### (3)    The kinds of sentences available

The Court has the ability to draw its own conclusions and apply these factors to fashion an appropriate sentence.  Both the Government and Defense have agreed that an appropriate sentence (subject to the Court's approval and determination) would be a period of incarceration for 36 months coupled with 10 years of supervised release.

### (4)    The kinds of sentence and the sentencing range established for – Sentencing Commission; the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines:

The Government and Defense agreed that the offense level is 19 (Zone D), and the Defendant's category is I.  Probation has agreed with that determination.

### (5)    Any pertinent policy statement

The defense is unaware of any policy statements issued.

### (6)    The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

The proposed sentence by the parties is consistent with the sentencing that offenders in a similar situation as Mr. Egelman have received.  The Court has a unique vantage point of seeing other cases like this one.  We believe that the Court has a clear understanding of the nuances and differences that each set of facts contain.  We further believe that the Court will be able to articulate the Court's reasoning at sentencing as to why the proposed sentence is just and fair, especially since the Government and Defense, along with the Probation Department, all concur that the proposed sentence is fair and appropriate.

## IX.  **Conclusion**

At sentencing, Mr. Egelman will address the Court and will take full responsibility for his actions.  He has struggled with sexual deviant thoughts and could not resist the urge to download child pornography.  There is no taking back what occurred and he is accountable for this sins.  However, justice is forward thinking and the focus should be not only accountability, but also preventing this from ever happening again.

In this case, it started with Mr. Egelman accepting responsibility, being open to therapy and actively pursuing it.  In addition, it can be seen by Mr. Egelman recognizing and accepting that he is going to prison, but wanting to go to a facility that is focused upon helping him overcome these problematic sexual attractions. These are encouraging signs and we can all agree that actions are bigger than words. Nevertheless, the Court will still have the hammer in hand should Mr. Egelman forget and slip back into the mindset that got him here because he have supervised release monitoring.

We are open to answer any questions or concerns the Court may have before imposing sentence.

We thank the Court for its courtesy and time, and we appreciate the Court's express your consideration and attention to this pre-sentence memorandum.

Dated: July 19, 2024
   Mineola, New York

___/s/_____
Donald Rollock, Esq.


___/s/_____
Michael Langer, Esq.


References

   Allam, J. (1998). Effective practice in work with sex offenders: A reconviction study comparing treated and untreated offenders. West Midlands: West Midlands Probation Service Sex Offender Unit.

Babchishin, K., Hanson, R. K. & Hermann, C. A. (2011). The characteristics of online sex offenders: A meta-analysis. Sexual Abuse: A Journal of Research and Treatment, 23, 92-123

Craissati, J. & Beech, A. (2003). A review of dynamic variables and their relationship to risk prediction in sex offenders. Journal of Sexual Aggression, 9, 41–55.

Hanson, R. K. (2000). Treatment outcome and evaluation problems (and solutions). In Laws, D. R., Hudson, S. M., & Ward, T. (Eds.), Remaking relapse prevention with sexual offenders (pp. 485–499). Thousand Oaks, CA: Sage

Hanson, R. K. & Morton-Bourgon, K. (2004). Predictors of Sexual Recidivism: An Updated Meta-Analysis. (User Report No. 2004-02). Ottawa: Public Safety and Emergency Preparedness.

Hanson, R.K., Bourgon, G., Helmus, L. & Hodgson, S. (2009). The principles of effective correctional treatment also apply to sexual offenders: A meta-analysis. Criminal Justice and Behavior, 36, 865-891.

Hedderman, C., & Sugg, D. (1996). Does treating sex offenders reduce re-offending? Home Office Research Study, no. 45. London: Home Office.

Hollis, V. (2007). Reconviction Analysis of Programme Data using Interim Accredited Programmes Software (IAPS). Unpublished report, Ministry of Justice.

Mann, R.E., Hanson, R.K. & Thornton, D. (2010). Assessing risk for sexual recidivism: Some proposals on the nature of psychologically meaningful risk factors. Sexual Abuse: A Journal of Research and Treatment, 22, 172-190.

Marshall, W. L. & McGuire, J. (2003). Effect sizes in the treatment of sex offenders. Int. J. of Offender Therapy and Comparative Criminology, 47, 653-663

Middleton, D., Mandeville-Norden, R., & Hayes, E. (2009). Does treatment work with Internet sex offenders? Emerging findings from the internet sex offender treatment programme (i-SOTP). Journal of Sexual Aggression, 15, 5-19.

Schmucker, M & Losel, F. (2009). A systematic review of high quality evaluations of sex offender treatment. Paper presented at the Annual Conference of the European Society of Criminology, Ljubljana, Slovenia.

Seto, M. C., Hanson, R. K., Babchashin, K. (2011). Contact sexual offending by men with online sexual offenses. Sexual Abuse: A Journal of Research and Treatment, 23, 124-145.

Wakeling, H., Howard, P., & Barnett, G. (2011). Comparing the validity of the RM2000 Scales and OGRS3 for Predicting Recidivism by Internet Sexual Offenders. Sexual Abuse: A Journal of Research and Treatment, 23, 146- 168.

**JESSE A. BACO**
40 Angle Lane
Hicksville, New York 11801
Cell: (516) 384-0013 ♦ E-mail: Jbaco320@yahoo.com

April ___, 2024

**VIA HAND DELIVERY**
Honorable Judge Joanna Seybert
United States District Court
Eastern District of New York
100 Federal Plaza, Courtroom 1030
Central Islip, New York 11722

Re: USA v. Egelman

Dear Honorable Judge Seybert,

 I am a lifelong resident of Nassau County, New York, and practicing family law attorney in Garden City, New York. I am writing this letter to provide your Honor with some information about my friend, Aaron Egelman, which I respectfully hope you will consider before sentencing.

 I have known Aaron since childhood, for over 30 years. We both grew up in the Salisbury neighborhood of Westbury, NY, attended Bowling Green Elementary School and W.T. Clarke Middle and High Schools in the East Meadow School District. We were in many of the same activities and classes growing up, and both graduated high school together, the class of 1999. We have remained good friends since that time. I attended his wedding in November 2014 to his Wife, Wei-Ming Liu, who is also a friend. I have regularly socialized with Aaron and Wei for many years, including being a guest in their homes, attending dinners, family functions and mutual friends' events. I know Aaron and his family very well.

 I was shocked, troubled, and saddened to hear about the recent case against Aaron because I have only known him to be a good friend, and a kindhearted and considerate person. I have never known him to do anything to harm anyone. While I understand the seriousness of his misconduct, as does he, I strongly believe his actions in this regard are a deviation and anomalous to his overall good character. In keeping with his character, he was readily prepared to and did assume responsibility for his actions. I have also seen Aaron regularly interact with his parents, William and Connie, and son, Joseph, and can attest he is a caring and devoted son and father. I also know him to be a smart, hard-working, and productive person, which I think is exemplified by his ability to quickly obtain new employment notwithstanding limitations while his case was pending.

 I also know the extreme level of genuine remorse, contrition, and deep regret Aaron feels for his actions, as he has expressed them to me personally over the last year, in particular the turmoil, pain, and devastation his actions have brought on his family. As a friend, I am also concerned about the negative impact any absence will have on Wei, Joseph, and William and Connie.

Page **1** of **2**

Based on the above considerations, I respectfully request Your Honor show leniency with respect to sentencing in this matter.

Respectfully,

Jesse A. Baco

To the Honorable Judge Seybert:

My name is Eric Egelman, I am a 62-year-old retired Podiatrist and former Board of Director for *The United Way* of Central Pennsylvania. I have a son Matthew, now a 31-year-old adult, currently living in Florida. Raising a child, working hard at my job, and community service are values I believe I share with my cousin Aaron Egelman. I am Aaron's eldest cousin, and have known him for 42 years, his whole life.  I've been asked to write a letter documenting my observations of his character, which I am happy to provide without reservation.

Aaron, and his wife Wei, will have their 10th anniversary later this year. They have one son, Joseph, who is currently 4 years old. I see Aaron and his family regularly at holidays, family occasions, and informal visits.  Over the past year, I have seen Aaron whenever I am visiting my Aunt and Uncle's house in Westbury NY, which is quite frequently.

Aaron and Wei each work full-time jobs to provide a good life for their family. Aaron currently works from home as a Help Desk Team Leader.  Wei works as a fundraiser for the NYC Public Art Fund. Until recently, despite working long hours at his previous job, Aaron was elected to the Board of Directors of his CO-OP association where he volunteered for several years. He took on this responsibility for the collective betterment of his fellow tenants who saw him as their community leader.

Aaron's interactions with his wife and son are best described as loving and caring. Aaron and Wei are dedicated and concerned parents. Over the years, I have observed Aaron read books, play games, and assist young Joseph with his Pre-K homework. Although currently not permitted to take Joseph to a playground or attend preschool events, Aaron remains involved with his son as best he can inside his parents' home.

Judge Seybert, my cousin will be coming to see you in court soon. He has admitted to breaking the law, he accepts full responsibility, and is remorseful for his actions. I know him to be a good person who made a bad choice, which will haunt him for life.  It is my hope that your honor will consider Aaron's past community service, his work ethic, and his dedication to family before rendering sentence.

Sincerely,

Dr. Eric Egelman
223 Captains Way
Bay Shore, NY 11706
(717) 903-8734

7932 Sonata Bay Pointe

Lake Worth, Florida 33467

United States District Court for the New York Eastern District

100 Federal Plaza

Central Islip, NY 11722

To The Honorable Judge Seybert

I am writing this letter as a character reference for Aaron Egelman. I have known Aaron for his entire life. I am proud to say Aaron is a person of exceptional character.

In my experience Aaron has always been a hardworking and responsible person. Aaron is always willing to help with my many computer questions and problems. Aaron is a loving son, husband, father, and brother. Since August 18, 2022 Aaron has had to stay in his parents' home, in spite of that he was able to get a new position at a Help Desk for a computer consulting company. Since his initial hire, he has received two promotions and a number of letters applauding his work efforts.

Under the most dire of circumstances, Aaron had done well in his work experience, and still maintains a very close link to his immediate and extended family.

Aaron is a person of strong character and I hope you will show leniency in his current situation.

Thank you for your consideration,

Mark J. Kletter

From: Matthew A. Lissauer
21 Oak Street
Woodcliff Lake, NJ 07677

To: The Honorable Judge Joanna Seybert
United States District Court
Eastern District of New York
100 Federal Plaza, Courtroom 1030
Central Islip, New York 11722

Dear Judge Seybert,

I am writing this letter on behalf of Aaron Egelman, whom I have known for nearly 35 years. We both met in first or second grade on a Boy Scouts trip and we instantly became close friends – almost like brothers. I was both troubled and completely surprised to hear of Aaron's case, as it flies against the person I have known for three decades. The Aaron I know is an upright and decent person, a committed family man, and a person who knows and understands that he made a grave mistake. I understand the seriousness of this matter and I hope the court will take into account the person I have known and grant him some leniency regarding his sentence.

Aaron has always been a good and solid friend over the years. He is a man of conviction and the kind of individual who always puts the interests of his family and others first. I've seen this time and again, whether it was how he stood up for the families in his apartment complex as president of his co-op board, or as the type of son and brother who would take a bullet for his own.

In our friendship, he has always been there for me, especially at a point in my life in my late 20s when I lost my job and was struggling with personal issues. No matter the circumstances, he was always there with a nonjudgmental ear and sage advice. Through his support, I was able to come out the other side. Had it not been for him and his words and understanding, I would not have had the courage to put myself out there to meet new people and take new career risks.

I have always known Aaron to be a gentle, caring, and devoted husband and father. When I got engaged, I remember him telling me that out of all the weddings he'd been to, mine was one that he wasn't worried about. I could say the same for him. He knew I found the one, and just the same I knew he found his match in Wei. Equally so, Aaron

was just as excited and ready to be a father.  I never once doubted his care and devotion towards Wei or Joseph.

Over recent years, even though we're now separated by rivers – he on Long Island and me in New Jersey – we remain close. I regret the distance, but whenever I do get a chance to see him it's almost like we've never been apart.

What I have seen through this ordeal is a man who knows and understands what he did was wrong. He is nothing but regretful and remorseful for all the pain he inflicted. While we don't get many second chances in life, I know from this experience that Aaron will be committed to making amends and using it to move forward and make positive changes in his life.

Thank you.

Sincerely,

Matthew A. Lissauer

To The Honorable Judge Seybert,

  I have known Aaron Egelman since birth, having been a close friend of his parents, Connie and Bill, for over 50 years.  My husband and I have celebrated holidays, his Bar Mitzvah, his wedding to Wei, the birth of his son Joseph as well as many family vacations both in NY and at our home in Maine.  Growing up, Aaron was known by us for his amiable disposition, caustic wit, love of animals and empathy towards others.  Along with being well read, I'm sure these qualities contributed to him being elected President of the Co-op board at their former residence. There he not only tackled challenging board issues with diplomacy and resolve, but spent many an evening of personal time helping elderly owners who turned to him for help on issues outside his duties.  He never said no, despite all the extra time this took from his personal life.

  The incident that brought Aaron to this point has been shocking and devastating to his entire family. He has suffered the loss of his personal freedom, his career and worse of all been restricted from seeing his son unless his wife is present. The shame of this is an open wound.  His wife and parents have had their lives upended, but have done their best to keep it from affecting his little son Joseph. They have complied with every restriction the court has placed on them since August of 2022.  Not being able to witness his only siblings wedding was another cruel blow to the family.  Aaron has taken responsibility and pushed forward. He has willingly embraced his weekly therapy, never missing a session. He sought and secured a lower level remote job with a company that has recognized his skill set and promoted him twice based on his performance with them over the past year. He and his wife have been able to hang on to their house as a result thus far. He has not left his parents home except for his counseling sessions and a court approved employer meeting.

  If justice can be served by actively participating in reparation and rehabilitation to once again make a positive contribution to society, then I believe Aaron is doing that.  I pray he will not be defined by his worst moment when the positives of his life represent so much more. Doesn't everyone deserve a second chance at redemption with proper monitoring?  Please take a whole life trajectory into consideration when making a decision as to Aaron's future.  I can see no positive results for society or the Egelman family by imposing incarceration in a prison.

With deep respect for the court,

Linda Rasero

243 Sebastian Way
Yardley, Pa. 19067
March 9, 2024

To the Honorable Judge Seybert,

We have known Aaron Egelman and his family since Aaron was two years old. His parents are our dearest friends and we have spent numerous holidays, evenings, vacations, and special events etc. with the Egelman family.

We have grown to know Aaron throughout these years as he went through all of the stages of his life. His marriage to Wei was an absolute wonderful addition as well as the birth of his adorable son Joseph. Their love for each other has clearly been a joy for all of us  to see. Any time we were together as a family , it was crystal clear to us that Aaron was a strong family man and a terrific dad.

For as long as I can remember, Aaron has been socially conscious . He was the president of his condo board in Great Neck and worked diligently to effect positive changes throughout the building. Aaron has always been involved with his synagogue and regularly attended holidays with his family. His devotion to his family is to be admired and we can safely say , from everything we have known about Aaron, that we cannot imagine he would ever be a threat to his family, friends or the community at large.

In addition I would like to say that during the past year and a half, Aaron's parents have been a backbone of strength to Aaron, Wei and Joseph. They have enabled Aaron to live in their home and to successfully work from their home. They have assisted Wei with the care of Joseph and have made sure that his life would continue to be as joyful as possible. Aaron has strictly followed the rules of the court, taking them very seriously with the absolute goal in mind of being reunited in his own home with Wei and Joseph. We all are looking forward to that day.

Sincerely yours,
Janis & Marc Schimsky

To:      The Honorable Judge Seybert
From:   Glenn Egelman, MD, MS, FACP
Re:      Aaron Egelman
Date:   10 March 2024

Your Honor,

It is with a heavy heart, but a hopeful soul, that I write you this plea.

I am a physician executive with the US Department of Health and Human Services, Countermeasures Injury Compensation Program. I work to compensate citizens who have suffered negative health consequences from COVID-19 vaccination. Immediately before that, I was the sole civilian medical director for the Department of Defense's TRICARE Health Plan, and coordinated the Agency's response to the COVID pandemic. I required COVID-19 vaccination for our men and women in uniform. I believe we saved countless lives by requiring vaccination, but I know that more than a few were injured by this requirement. Good people recognize when others are injured by our actions, and we do all we can to make things right, learn from the experience, and not repeat the offense. And that is why I have now dedicated my life's work to a victim compensation program.

As one of Aaron's older cousins, I have known Aaron his entire life. Even though there are miles between us, we remain a tight-knit family. We support each other through challenging times and we celebrate our life successes. Aaron is a loving father to Joseph and husband to Wei. He is a dedicated son to my Aunt Connie and Uncle Bill. He has been a supportive cousin to me and my brother, Eric. I think it is important to add that I have never had any concern about the safety and welfare of Aaron's son, Joseph. Aaron's love for his son is without limit. I have never seen him do, or heard him say, anything harmful to Joseph.

So, it was horrific, and a bit surreal, to learn that Aaron viewed on-line child sexual exploitation material. It was deeply painful to think that Aaron's viewing of the material could perpetuate the societal damage caused by this material. Over the following year, I contemplated how he could recognize the others injured by his actions, what he could do to make things right, what he could learn from the experience, and how could he not repeat his offense.

Aaron and I have spoken about his situation. He would do anything in his power to turn back time to undo the harm he caused. His shame is overwhelming; his hope to heal and his efforts to heal are massive; his desire to make amends has no bounds. He recognizes that others have been injured by his actions and deeply wants to make things right.

But there is no clear answer as to what he can do to make things right. Without direct knowledge of the victims, how does someone who has viewed on-line child sexual exploitation material make amends to the children hurt? Spending time in prison does not accomplish that. On the contrary, it only hurts his son Joseph, who would not have access to his doting father during key formative years in Joseph's development. If Aaron goes to prison, Joseph becomes an additional victim of this horrific, surreal situation.

Aaron could try to make things right on a broader community/societal level. In addition to continuing the work he has been doing for the past year on his personal rehabilitation, he could work in group and community prevention programs, child safety programs, etc. But again, spending time in prison precludes him from making efforts in this arena. Yet, this is precisely the type of work that has been

shown to help societal efforts to diminish the creation and dissemination of child sexual exploitation material. It also can prevent recidivism in someone like Aaron, a deeply caring and loving man with a strong, supportive social and family network.

As you know, Aaron is an active participant in therapy to help him understand the complex nature of his actions. By doing so, he is learning his weaknesses, he is learning how to manage them, and he is learning how to strengthen his character. These are also key features in preventing recidivism. My personal communications with Aaron have demonstrated to me that his therapy is going well. I am confident that his therapist will express similarly. If Aaron were to head to prison, the therapeutic relationship that he has developed over the past year would be disrupted. The progress he has made working toward his rehabilitation would come to a halt.

Your Honor, my cousin Aaron is a good person who has done a horrible thing. Our close-knit and supportive family has tried to, and still wants to, accomplish whatever we can to help Aaron heal. Aaron has already suffered significant punishment, as have my aunt Connie, my uncle Bill, and my cousin Wei. It is heart-breaking to think that Wei and Aaron's son, Joseph, may not have his father in his life during these most important formative years.

Aaron is a good person. He recognizes that others were injured by his actions, he wants to do all he can to make things right, he wants to continue to learn from the experience, and he will not repeat his offense. In a man like Aaron, continued effective, strong, therapeutic personal (+/- group) therapy and rehabilitation, plus work in community prevention programs, while being surrounded by his supportive family in a home environment, would accomplish so much more towards rehabilitation and prevention of recidivism than punishment through years in prison. His son, Joseph, does not deserve to be another victim of this horrific and surreal situation.

Accordingly, it is with a heavy heart, but a hopeful soul, that I write you this plea.

Please do not send Aaron to prison.

405 Emanuel Way
East Meadow, New York 11554
March 11, 2024

The Honorable Judge Seybert:

It might sound like a cliché to say that we have known Aaron Egelman since day one. But in this case, it is actually true. (His dad was the best man at our wedding so it stands to reason that we would be among the first to hear of his birth.)

And it has been our pleasure to watch him grow from a curious, intelligent tot to the fine young man he is today. We have shared countless holidays and special occasions with Aaron and his family which have given us the opportunity to see Aaron interact with his friends and family members. Aaron has always been a devoted and most appreciative son who has an extremely warm and wonderful relationship with his parents. His brotherly love, (whether engaged in deep conversation or horseplay) is apparent, as well. When Aaron married and had a child of his own, all of his positive traits extended, beyond measure, to his wife and son. Aaron is a devoted husband and dad, beautifully and willingly sharing the responsibilities of raising a young son, who by the way, adores him.

We truly admire Aaron in his roles as son, brother, husband, daddy, and friend. We might add that Aaron has also served his community in different capacities. The most admirable position he held was president of his coop board. We also know that Aaron is a responsible, reliable, trustworthy, respected, and hard-working guy, as evidenced by the demanding positions he has held over the years. His current stressful and worrisome situation has not dampened Aaron's motivation to "keep on keeping on". He was recently recognized and honored by his current employer for his outstanding performance on the job.

As you can see by this glowing yet honest account of our knowledge of Aaron, we think the world of him. We are all human and therefore there is not one of us who has not made a mistake in his/her lifetime. But there is one of us, (Aaron), who has already faced the consequences while still carrying on as devoted member of his family and productive citizen. It is our fervent hope that you will recognize that Aaron deserves to go on as a normally functioning, active, and integral part of society.

Sincerely,
Millicent and Stephen Reich
516.241.7240

117-01 Park Lane South B 6i

Kew gardens, NY 11418

March 11, 2024

The Honorable Judge Seybert:

I have known Aaron Egelman since he was born. I spent time with him whenever I visited his parents' home. I watched him grow up. He still calls me Uncle Seth.

He is a very intelligent, thoughtful, kind and considerate person. He respects others and has a history of being very helpful to others. He is a very caring husband and a wonderful father to a beautiful 4-year-old. He is a loving son and brother.

Several years ago, he bought a co-op in an administratively and financially troubled building. There were many senior citizens living in the building. Aaron was elected president of the co-op. He worked day and night to get the co-op on firm financial grounds. He told me many stories about how he would meet individual residents, many of whom were senior citizens, and offer all kinds of assistance to those who could not help themselves. I heard him take phone calls on Saturdays and Sundays when seniors had problems with their apartments. He was patient and helpful and empathetic during these calls. When he moved to his current house, the co-op was on much firmer financial grounds. I am sure most residents were very grateful for his friendship, concern and help.

This same kind of commitment and responsibility could be seen by his professional work. Aaron was employed as a tech expert at a computer chain while he was still attending High School! He dealt with many stressed customers who had computer problems. His last job was as a tech director at a school for students with very special needs. There were times when Aaron would work very long hours, at night and weekends when equipment was not functioning properly. He did not receive compensation for this extra work. His dedication to his work, his strong work ethic and his professional skills have made him highly valued by his employers and staff members.

I was a school counselor at the New York City Department of Education for 16 years and I know that Aaron has a lot of very impressive qualities. He has a history of caring about others who needed help and assistance and he has the intellectual and social skills that have proven to be a great asset to his community and family.

I hope that the court will take into consideration all the important contributions Aaron made to his family and community when deciding his sentence.

Most sincerely,

*Seth P. Welins, Ph.D*

Seth P. Welins, Ph.D

789 Birchwood Drive

Westbury, New York 11590

March 14, 2024

Dear Honorable Judge Seybert:


I'm writing this letter in the hope that sharing some important information about my son, Aaron Egelman's character and personal experiences will provide you with some insight into the kind of person Aaron is.  He made a serious error in judgement which has resulted in consequences that have affected him, our family and others.  Had he been aware of the devasting effects of this behavior, I am convinced he would never have engaged in this activity.  I have also never known him to intentionally ever hurt anyone.

As a child, Aaron was sensitive, inquisitive, and thoughtful.  He was and still is motivated by solving problems.  Fascinated with computers, at an early age he taught himself basic computer programming.  In high school because of his love for history and politics, he became actively involved in Model Congress and was eventually elected General Chair.  He was a member of the high school chorus and participated in concerts and music festivals.  In his senior year, he was nominated by our Rabbi, Judy Cohen-Rosenberg, as a candidate for "Project Understanding" (an interfaith experience which involved travel to Israel and Rome).  He was selected as one of 20 students to partake in this extraordinary experience which familiarized and fostered understanding among Christian, Muslim and Jewish students.  While in college Aaron helped to finance his education by working in positions that enhanced his technology skills.

Aaron is a caring person and has concern for others.  Aaron is a devoted husband and father.  Family is of paramount importance to him.  As a husband, he equally shares in household and childcare responsibilities.  He delights in the time he spends reading and playing with his son, Joseph.  As a son, Aaron is loving and thoughtful and is always on hand to celebrate holidays and special occasions with us.  When asked he is always willing to lend a helping hand.  He has a close and loving relationship with his brother, and they enjoy spending time together.

As a concerned and caring friend, he once alerted us to the fact that one of his friends was talking about suicide.  We connected him to a psychologist friend who guided him into making the appropriate intervention. Over 15 years ago, he rescued a stray cat (over my objections) nursing it back to health.  To this day he still cares for it, making sure it visits the vet to get its shots and meds.

 More recently while living in his former co-op, he took on the time consuming and often stressful task of serving on his co-op board and was eventually elected President.  His leadership and actions resulted in changing the finances of the building from red to black, getting rid of an unscrupulous building superintendent and saving the parking lot of the co-op building from being turned into a high -rise apartment. (The latter accomplishment involved working with other community groups, buildings in the area and local government.)

Aaron has spent almost the last two years confined to our home. He has been diligent in adhering to the restrictions imposed on him by the court. He has not left our home with the exceptions of going to his weekly therapy sessions, court appointments, and for rare medical appointments. Selected by his brother to be his best man, Aaron was unable to attend his brother's wedding and has missed other family events taking place outside our home. He's been unable to go to his son's various pre-school events or just spend time with him at a park outdoors.

During this time period Aaron has made positive strides. He has been employed with a technology firm working remotely, has been promoted twice and is now serving in a leadership position. I often hear him as he works. He is a professional and sensitive leader. Just recently he was recognized and awarded a prize by his firm for his contributions.

He is actively engaged in his therapy and I believe has a better understanding of what may have led him to this point in time. He is extremely remorseful and devastated by the collateral damage his behavior has caused. We are all suffering, anxious and distressed about what the future holds for Aaron and his family. Our lives have been indelibly altered but our family, and our dear friends are all determined to do whatever is necessary to help and support Aaron through this difficult period.

It is my hope, Your Honor, that you will consider some of the information I have shared when sentencing. Aaron has many positive qualities.

Would justice not be better served if Aaron could re-unite with his family and continue to provide for their welfare? As an educator and counselor for over 40 years, I believe that rehabilitation, restorative justice and making positive contributions to society would be more productive than further punishment in this particular case.

Thank you for your time and consideration. Should you have any question or need any additional information please contact me.


Respectfully Yours,

Connie Egelman

```
        Joseph Provetto, LCSW
        839 S. Cornerstone Lane
        Heber City, Utah  84032
             914-450-6632
```

March 14, 2024

To the Honorable Judge Seyburt,

   I am writing this letter in support of Aaron Egelman in consideration of his sentencing. I have known Aaron's parents, Connie and Bill, for more than fifty years, and I know Aaron since he was born. He grew up in an intact loving family with good values, and I have always known him to be a good person.

   The sense of loss he has experienced since his arrest has been a clear punishment. In sententencing Aaron I am sure you will have a great deal to consider. At this time I would like to respectfully ask that you consider the possibility that further punishment in the form of incarceration may only serve to reinforce guilt. Although I have not treated Aaron, in my professional experience I have known guilt to cause people to act in destructive ways, whereas remorse can be constructive and cause more conscious and productive actions. Aaron has indeed been very remorseful especially for how this is affecting his son, his wife, and his family. He has tried to put his best foot forward and turn this remorse into as healthy a way of being as possible under the present circumstances.  He has maintained a job, continued with therapy, and complied with all the restrictions that have been placed on him. When Wei has been present, and he has the opportunity to be with his son, he is a loving father.

   I implore Your Honor to take into consideration that being in a prison population and being deprived of the consistent therapy he is receiving could negatively affect the progress he has made and make recovery more difficult. In addition, his role as a father would be further diminshed. Aaron's son, Joseph, is in his formative years. If Aaron is in prison, Joseph would hardly be able to see him, if at all. Please consider how incarcerating Aaron would pass the consequences of a terrible mistake that he has made on to the next generation and how adversely and long term it will affect his young son.

Respectfully,

Joseph Provetto

Joseph Provetto

Pamela M. Provetto
839 S. Cornerstone Lane
Heber City, Utah  84032
914-450-6683

March 13, 2024

To the Honorable Judge Seyburt,

   I am writing on behalf of Aaron Egelman. Aaron's parents are my oldest and dearest friends. I have known his mother, Connie, since we were in first grade together. I have known Aaron since he was born.

   I have always known Aaron to be a good person. He has always had a close and loving relationship with his parents and his brother, Jeremy. When he married Wei and they had their son, Joseph, I witnessed first hand the joy being a father brought to Aaron and how loving, kind, and thoughtful a father he was.

   When I learned that he had been arrested, it was incredibly difficult to believe. What he was being accused of was totally incongruent with the Aaron I know. I can only imagine that some crazy tech curiosity led him to make this mistake, but I am certain that Aaron would never hurt anyone.

   While under house arrest for almost two years, this mistake has cost him dearly. He has suffered greatly, as has his family. He lost a job he loved, he has not been able to live with his wife and young son, and he has not been free to go about life in any normal way.  His wife and his parents have stood by him during this very difficult time, and his parents have upended their lives to lovingly support Joseph and Wei and to provide as consistent as possible day to day environment for them. With their support, with Wei present, Aaron has been able to see Joseph, but his role as a father has been severly restricted. I can't help but wonder what the long term effects will be on Joseph. I know this weighs heavily on Aaron.

   Although Aaron has made a terrible mistake, my heart breaks for him. Not only has he been living with the consequences for almost two years, but also because he is so remorseful for what this has done to his son, his wife, his parents, and his brother. The knowledge of how this has affected the ones he loves has been his worst punishment. In spite of it, he has tried to carry on as best as he can. He is conscientiously working at a new job and doing well, he has maintained a consistent relationship with a therapist, and he has complied with all of the restrictions placed on him during these past two years.

   I have no doubt that Aaron in no way poses a threat to anyone. I can't imagine how further incarceration will benefit society in any way. Aaron has indeed learned a very costly lesson. I hope in sentencing, Your Honor can consider the price Aaron has already paid and can believe that justice will be much better served if Aaron is given the chance to be a productive member of society again and most importantly to return to a normal role as a committed and loving father to Joseph.

Sincerely,

Pamela Provetto

Pamela Provetto

3/14/2024

To the Honorable Judge Seybert,

I am writing to provide what I believe will be some helpful information concerning Mr. Aaron Egelman.

I have known Aaron literally since the day he was born. His father, Dr. William Egelman, and I were colleagues who worked together for more than 45 years as faculty members at Iona University. Almost immediately after we met, Bill and I became not just colleagues but good personal friends and through Bill, came to be very close to Bill's wife Connie and I became what you might call an unofficial adopted aunt for Aaron and his brother, Jeremy. So, I believe I know Aaron and his family as well as one can know a non-blood relative.

Aaron has always been a hard-working and honest individual who has always maintained the closest of ties to the members of his family and his friends. He is highly skilled in the computer field where he works primarily as a Service Desk Team Leader.

Prior to becoming aware of his use of child pornography, I never had any reason to be critical of Aaron in any aspect of his life. I am certainly not qualified to diagnose what inner compulsion led him to his inappropriate and in fact criminal behavior, but what I do know is that he is fully remorseful and understands how he must correct his life or else it would be destructive to himself, to his wife and child, and in fact, to his parents, brother, and entire family.

It is important to note that Aaron's family is fully prepared to do whatever is necessary to make Aaron move beyond this time in his life and to be able to return to once again to being a productive and law-abiding member of his community.

This decent and honest man had some inner compulsion that led him to behave in a manner that was illegal and totally inappropriate. He has already paid a heavy price for that behavior and has no intention of replicating it. He will not be alone in his struggle to control this behavior because of He has an excellent support network from both his relatives and his friends.


Thank you for reviewing my comments.

Respectfully submitted,

Catherine E. Stratton, Ph.D.

Professor Emerita of History and Geography

Iona University

Rabbi Judith Cohen-Rosenberg

210 Rocky Hills Road

Pittsboro, NC 27312


March 15, 2024


The Honorable Judge Seybert

US District Court

Eastern District of New York

225 Cadman Plaza E.

Brooklyn, NY 11201


To the Honorable Judge Seybert:


Aaron Egelman has been my parishioner for the past 30 years and continued a pastoral relationship with me after I retired from the congregation with which we were affiliated. During that time, Aaron has been an eager student, preparing for Bar Mitzvah through age 13 and continuing to study and become Confirmed at age 16. Even as he attended college, Aaron returned for Jewish holiday celebrations. I always looked forward to his accompanying his father performing ushering duties on Rosh HaShana and Yom Kippur. He has always maintained a presence of humility and humor.

It was my pleasure to officiate at Aaron's wedding to Wei and to help in the naming of his son, Joseph.

Recently, I was honored to officiate his brother Jeremy's wedding, but saddened that Aaron could not attend. We have, however, remained in contact, speaking about his plight and his quest for personal understanding, forgiveness and redemption. I am reassured that Aaron is seeking a path to those goals through

therapy and maintaining connections to his faith. His wonderful family, his parents, Connie and Bill, his wife and son and his brother and sister in law are also involved as  Aaron's support with consultation with me as necessary.

I have every confidence that through Aaron's personal efforts, the love and care of his entire family, his inherent intelligence, wit and humility, he will make a successful re-entry into society to continue as the hard working family man I have seen him become from childhood on.

Thank you for your time and consideration.

Most sincerely,


Rabbi Judy Cohen-Rosenberg

Rabbi Emerita

Temple Or Elohim, A Community Reform Congregation

Jericho, NY

March 15, 2024


Steve Egelman
1224 7th Ave., #3
San Francisco, CA  94122

To: The Honorable Judge Seybert
Re: Aaron Egelman

Dear Judge Seybert,

I'm Steve Egelman, first cousin to Aaron Egelman.  I've known Aaron since he was born.  Although I haven't spent as much time with Aaron as I'd like (I've since moved from Westchester County to California), we've enjoyed many family gatherings, holidays, and special occasions over the years. I've always found Aaron to be considerate, thoughtful, and very family-oriented and caring.

I'm writing to speak to Aaron's character.  In particular, his sense of and dedication to family.  Some of my earliest memories of him are the close bond and love he shares with his brother.  Later, it's been a pleasure to watch his caring, supportive, and fun interactions with his wife and son.  And throughout, I've noted how much he cares for and supports his parents (my aunt and uncle):  Helping during family gatherings; spending time with them; interacting with them as a loving and dedicated son. They are a close family, and I know Aaron's support of his parents means the world to them.

Thank you for taking the time to read this.  I believe that Aaron knows he's made a serious mistake, and understands he is accountable for his actions.  Still, I ask the court to show leniency in his sentence, taking note of his lifetime of unwavering love, support, and dedication to his brother, his wife and son, and his mother and father.

Sincerely,

Steve Egelman
steveegelman@gmail.com
415/699-5195

**Christian Robert Pokorney**

1140 Amherst Terrace
Inverness, FL 34452
(971) 678-7238
keysersozy@yahoo.com


16th March 2024


**Honorable Judge Seybert**

U.S. District Court - Eastern District of New York
225 Cadman Plaza E
Brooklyn, NY 11201


To The Honorable Judge Seybert,


The purpose of this letter is to illustrate to you the character and poise Aaron Egelman has embodied throughout the multiple decades he and I have known each other.


Aaron and I first met in 2004 as we embarked on a path of collegiate education at SUNY Purchase College. Immediately, Aaron Egelman conducted himself with the type of grace and fellowship not often seen in those in their early twenties. He was kind and accepting of all individuals that we encountered while displaying a sense of civic pride and inclusivity that was inspiring to people around him. It was clear to me that Aaron was the type of person that did not make decisions based on impulse, but rather sought tirelessly to ensure his actions were mutually beneficial for society at large. He is never one to dismiss an individual's point of view, but rather sought to gain a clear understanding of what motivates us collectively in order to create a better, more stable, tomorrow.


Throughout the years that followed Aaron and I continued to be a fixture in one another's lives while opening our homes and families to each other. This included Sunday dinners, birthdays, milestones such as the birth and religious sacraments of my nieces, and his subsequent matrimony to his

wife. I can state without hesitation that he is an exemplary father to his son and I take comfort in the fact that he is molding and imparting his wisdom on future generations. In short, I'm thankful to know Aaron Egelman and firmly believe that his presence in our lives is beneficial and necessary. I thank you for the time you've devoted to reading this letter.

Sincerely,

Christian Robert Pokorney

March 18, 2024

To the Honorable Judge Seybert:

This letter is in reference to Aaron Egelman. To be fair and clear, I am Aaron's father.

Since August 18, 2022, Aaron has resided in my home at 789 Birchwood Drive, Westbury, N.Y 11590. This was determined by the "Order Setting Conditions of Release.

I am not an attorney, and do not understand all that has transpired. He is accused and has pled guilty to watching child pornography on his home computer.  I do not know why Aaron participated in the behavior he did. What I would like to address to the court is what has occurred since his incarceration in my home. I understand being incarcerated in my home is not the same as being incarcerated in a prison. Nevertheless, he has paid a price for his actions, and following the rules of his release,  his everyday behavior has been severely limited.

After his arrest, he lost his job from his previous employer. He was able to attain a new position and work from my home. He has received two promotions since he began his new work.

With the approval of the court officers monitoring his behavior, he sees his wife and son on a regular basis. The "order" he is living under states he can only see his son with my daughter-in-law present. This stipulation is part of the agreement even though there is absolutely no evidence that he is a threat to his son. On the contrary, he is a doting father, and loving husband. I realize this is impossible, but if you, your Honor, were able to spend 15 minutes in my home observing them this truth would be obvious.

Additionally, I would like to point out that there may be other defendants who are as conscientious about obeying the court order as Aaron, but no defendant could be more obedient.

It is my understanding that home incarceration does not count toward "time served." I do not know if this is true but it is what I have been told. As a non-legal person this makes no sense to me.

During his incarceration in my home, he has not:

- Taken a walk around the block.
- Taught his four-year hold son how to ride a bicycle.

- Taken his wife out to dinner.
- Taken his son out for pancakes at IHOP.
- Attended his brother's wedding (December 3, 2023).

What he has been able to do is see his court-appointed therapist every Sunday. He has paid several visits to doctors and dentists. He made one visit to the offices of his employer.  He was allowed to take his cat for a veterinary appointment. All these activities were under the supervision of the court officers.

I know I am the defendant's father, and I am biased. My son did something terribly wrong. I am not in any way lessening the seriousness of his actions. As a father and grandfather, I can empathize with the young victims of his behavior. However, he is now making every effort to change. He has undergone a rehabilitation process with his therapist. He has great remorse and clearly understands the consequences of his actions.

Aaron is not a social isolate. He is embedded in his immediate family, and an extended family. He has paid a price for his actions. I do not believe he is in any way a threat to society.

The question, which is in your hands, is what happens next. Is a prison sentence appropriate in this case, or are there some other options that make more sense and are more just?

I beseech you to take all these comments into consideration. I do not know the origin of this expression, but I plead with you to temper justice with mercy.

Respectfully submitted,

William Egelman

Jacqueline Egelman
5631 California Ave SW 302
Seattle, WA 98136
March 19, 2024

To: The Honorable Judge Seybert
Re: Aaron Egelman

Dear Judge Seybert,

My name is Jacqueline Egelman, I am one of Aaron's aunts and have known Aaron all his life.
I am writing to tell you about the Aaron I know.

Before moving to Seattle 2 years ago, I lived in Westchester County with my husband Abe, who
passed 12 years ago, and our two children.  Although we didn't live right next door to Aaron
and his family who lived in Westbury, we enjoyed spending many happy occasions together -
picnics, holidays, special ceremonies, just-like-that get-togethers - as often as we could, and we
were able to watch Aaron and his brother Jeremy grow into responsible adults.

Over the years and since my move to Seattle, I have kept in touch with Bill & Connie (Aaron's
parents) regularly and we've shared what and how we and our families are doing.  I must admit
that when Bill told me two years ago that Aaron had made this serious mistake, I found it hard
to believe.  As we've kept in touch weekly, I've learned that Aaron has been going to therapy,
has continued to be a responsible husband, father, and caring son, has maintained a full-time
job, and has been following all the rules and regulations.

In November, after returning from the East Coast for visits with family and Jeremy's wedding, I
was told Aaron chose to plead 'guilty'.  I wrote him to tell him that if I had known when I saw
him, I would have given him a big hug and that I wanted him to know that he's loved, in my
thoughts and prayers and I wished him as much help, support and peace as possible in the days
ahead.  I received a note back from him that deeply touched me.   Part of what he wrote is that
he can bear the consequences of his mistake, but feels very badly that his family and all those
he loves and love him have also had to go through this with him.

I'm sorry this is so long and wordy, but I hope this will address Aaron's character, that he knows
and accepts what he did was wrong, and has been doing what he can to atone.  I am hoping
Your Honor will take this into consideration and impose as lenient a sentence on him as
possible.

Sincerely,
Jacqueline Egelman
egelpac@yahoo.com
206 402-3020

Mar. 26, 2024

To the Honorable Judge Seybert:

This letter is in support of your consideration of sentencing for Aaron Egelman. Aaron has been known to me for forty years and as I've seen him grow and mature has demonstrated nothing but true responsible behavior, love for his parents family and others close to him and absolute contrition for his recent transgression.

Having spent the past year and a half restricted in his movement and relation with his wife and son he has clearly expressed both remorse and feelings of guilt for how his actions have affected his life. That past year and a half have been punishment as anyone might define it to be. Any amount of leniency as he is sentenced would not put his family, acquaintances or strangers at risk as I see things.

As a scientist, physician and investment adviser I appreciate that strict interpretation of facts typically benefits from the application of art in practice. I respectfully request you also consider the soft edges of art encircling the cold, hard factual considerations and apply suitable leniency in your determination.

Respectfully,
Mark S Brody , PhD, DO

March 26, 2024

Felicia Egelman
3318 30ᵗʰ Ave SW, Unit B405
Seattle, WA 98126

To the Honorable Judge Seybert,

My name is Felicia Egelman, and I am Aaron Egelman's first cousin. For most of our adult lives, I have lived across the country in Washington State. However I would often return to the East Coast for holidays and family get-togethers, and it was during these occasions that I was able to spend time with my extended family, including my Aunts, Uncles and cousins on my Dad's side of the family.

I remember sitting around the dinner table at my Aunt Connie and Uncle Bill's house, and listening to funny stories Aaron would tell, and how he would joke around with his brother Jeremy. He would praise his Mom's cooking, and feast on the amazing meals she would make, as we all would! I attended Aaron and Wei's wedding, and saw him surrounded and loved by so many friends and family. I remember sitting out on Aunt Connie and Uncle Bill's back patio one visit shortly after the end of the pandemic and seeing my aunts, uncles and cousins for the first time in a long time. Aaron and Wei's son was getting so big, and full of energy, and I could see how much Aaron and Wei enjoyed his antics and playing with him.

I was very sad to learn of the serious mistake Aaron had made. I understand that he's taken responsibility for what he has done, and has been working hard to turn things around by attending therapy, working a steady job, and complying with the limits and requirements placed on him. I know the toll this has taken on his family weighs heavily on him.

I respect the law and the role it plays in our society, and I know that actions have consequences. However, I wish to ask the court for leniency in Aaron's sentence. He has a strong support system, a loving and stable family, and I believe that he has learned from this experience and will do better going forward.

Yours Sincerely,

Felicia Egelman
fegelman@hotmail.com
206-372-8260

28 March 2024
Scott D. Perrell
21-11 33rd Avenue, 1st Floor
Astoria, New York, 11106
(516) 246-3496
scottperrell@yahoo.com

The Honorable Judge Seybert
U.S. District Court - Eastern District of New York
225 Camden Plaza E.
Brooklyn, New York, 11201

Dear Judge Seybert,

Having the pleasure to call Aaron Egelman a close personal friend since 1996, please know how shocking and disappointing it was to learn about his recent infraction.  It is my hope that in learning a little more about Aaron, you might select leniency over more severe punishments within your purview.  If any individual does deserve that leniency, it is Aaron.

I knew I liked Aaron immediately when we met in my freshman year at W.T. Clarke High School in September of 1996.  Slightly older, with a similar affinity for politics, history, and earnest debate, Aaron gave freely his friendship to an awkward, lonely new student.  Giving without thought of reward - a theme he has repeatedly demonstrated - Aaron introduced me to his circle of friends -  many of whom became shared, lifelong friends - and his after-school clubs, most notably the debate club, which we both would have the honor of running as President by the end of our respective tenures.   It is safe to say that I would not have enjoyed those awkward, formative teenage years nearly as much as I did without Aaron by my side.  That relationship continues today.

Aaron believes in dialogue, and a sort of intrinsic altruism shared across all of Humanity.  Aaron saw the virtues in me without reproving my faults.  He correctly chided me when warranted, yet it was the specter of disappointing him that spurred growth in my character more than words could hope to achieve.  Through it all, Aaron always takes the time to understand me when another individual might let a 28-year friendship dwindle.

It is in that same spirit I appeal to you on Aaron's behalf for leniency.  Know that I am but one amongst many who expect to hold him to account moving forward.  Thank you, Judge Syebert, for your time and please feel free to have your staff contact me at any time.

Sincerely,

Scott D. Perrell

3894 Avoca Ave
Bethpage NY 11714


March 30, 2024

U.S. District Court - Eastern District of New York
225 Cadman Plaza E,
Brooklyn, NY 11201

Honorable Judge Seybert,

   I'm writing this letter on behalf of Aaron Egelman. The company had just moved from
Garden City to new offices in Syosset in 2007. I first meet Aaron when he came to work
for Win-Holt Equipment Corp. His position was to support the pc users and LAN
network, (servers, routers, modems, wi-fi, internet access, e-mail and cell phones). We
quickly became a good working team supporting one another, in our efforts to support
the companies associates. He quickly jumped in and cleaned up some loose end from
the relocation, including the installation of wi-fi in the conference rooms.  I found Aaron
to be knowledgeable, friendly, cooperative and supportive with our fellow associates.
Aaron was often asked to resolve user created problems, which often can be taxing.

   One has to take into account working for Win-Holt was a very difficult place to
succeed. The company being privately held, one could save they had champaign taste
and a beer pocketbook. The ownership of the company had no boundary for separating
business and personal technology needs. For an associate who worked for the
company supporting operations, one would have to be resourceful.  Be resourceful
might be finding new vendors, shopping for a better price, looking for an alternative
solution. During Aaron's tenor with the company, he proved his worth finding solutions,
better pricing, and completing projects.

   Part of Aaron responsibility was to make sure our systems were safe, using firewall to
keep unwanted visitors and keeping current anti-virus software on all pc's. This often-
meant inspecting vendors and auditors pc equipment before allowing them to use the
company wi-fi. One final note we work together on a joint project to upgrade the phone
system. After much evaluation of the company's needs, looking for new product and
vendors to support a new solution. We present a new phone system which was installed
and immediately return dividends in work place productivity. Even though the system
came with a price, the systems ROI paid for itself in less than 5 years. As of 2019 when
I retired from the company the phone system was still paying dividends.

   As I mentioned before we first meet in 2007 and worked together for the better part of
seven years. In the years since we would speak on an occasion to catch up or ask for
advise on a technical matter. I have found Aaron to be friendly, courteous and helpful.
On one occasion I was sick and was unable to be in work, as it turned out to be a

Jewish holy day.  Aaron did go to the office to make sure we have staffing in the department, missing time with his family. Having many conversations with Aaron, I learned Aaron has a strong grounded Jewish faith.  He loves his family as well as celebrating with them on the holy days this meant a lot to him.


Sincerely

John Cunneen

**Paul A. Greene, Ph.D.**
**Psychologist**

**68 Lambert Lane**
**New Rochelle, New York 10804-1010**
**(914) 235-6171**

March 31, 2024

To: The Honorable Judge Seybert

I am writing to relay my experience and interaction with Aaron Egelman which I believe reveals an important trait of his character.

It was around the time when he was turning thirty, an important milestone. He was concerned about the welfare of a good friend, so much so that he asked his father for advice. His father, a colleague of mine at Iona University, turned to me as his question related to an area within my expertise, suicidality. It was not Aaron who was suicidal but his friend. I offered the advice that I have given to others, that is, what one has to do as a friend or as anyone who feels morally obligated. The advice is actually quite simple. That is, one must act to save a life. Even remote hints of suicidality must never be ignored. Such feelings need to be talked about if not with the potential victim, then others who care about them and also with professionals. The risk of rejection by the person who may be at risk of hurting themselves pales in comparison to the risk to all concerned if no action is taken.

Although the advice is simple, and the question put to me seems straightforward, it is too often tragically avoided. Most people in my experience avoid the conflict. It requires courage to admit that a friend is suggesting hurting themselves. More courage is required to then ask a professional how to respond, and even more courage to do the right thing.

Aaron Egelman did the right thing. That trait speaks volumes about his character.

Sincerely yours,

*Paul Greene, Ph.D.*

Paul Greene, Ph.D.
Professor Emeritus
Psychology Department, Iona University
Distinguished Fellow, NYS Psychological Association
Licensed Psychologist NYS#005968
Virginia Clinical Psychologist #0819997597
Hawaii Psychologist License #2014

Linda DeVito
1239 Hollywood Avenue
Bronx, NY  10461-6141

April 2, 2024

To The Honorable Judge Seybert,

My name is Linda Devito and I am currently retired working part-time in a local garden center.  I have known Aaron Egelman his entire life.  Aaron has always been a loving and caring nephew since his childhood

I am writing to defend Aaron because he has always been a respected person in the community and by his friends and employers.

Aaron has been very helpful to me whenever I needed him—be it for technical assistance with setting up my myriad electronic gadgets or for other help (yardwork, household cleanup, etc.)

Aaron is a devoted husband and father.  He is caring and attentive to both his wife, Wei, and their son, Joseph.  He is active in Joseph's educational upbringing, working with him in academic endeavors and in providing recreational fun to the extent that he is able.

It is unfortunate that he is in this situation.  It is obvious to me through my observations that Aaron will do, and has done in the past several years, all that he can to resolve the situation.  I am sure he is truly sorry for any distress that he has, or may have, caused.

I hope that this letter can go some way in convincing the court that Aaron is a good person, and this testimony will be taken into consideration.


Yours truly,

Linda DeVito

Jeremy Michael Egelman
1755 York Ave Apt. 15a
New York, NY 10128
516-458-9712

April 4th, 2024

To The Honorable Judge Seybert,

My name is Jeremy Michael Egelman, and I am pleading on behalf of my brother Aaron David Egelman.

Alongside my father, Aaron is my hero.  He is three years older than me and was instrumental in helping me become the man I am today.  I am currently a New York City Public School Teacher, working in the Bronx, in a community school, with special needs kindergartners and 1st graders.  I am working with students who are living in public housing or shelters,with learning delays that truly make them some of the most vulnerable children we have in this great country.  My work in education and desire to help those who need the most help stem from my brother; both from his influences and his direct relationship with me over the years.

Our bond runs deep; one of the oldest memories I have of my brother was being scared at night of the darkness, and I would sneak into my brother's room and he would let me lay next to him in bed under the covers.  We would "raise the monster shields!" so I was protected and then we would talk to take my mind off of them.  Talk about any sort of silly things that 7 and 4 year olds talk about to make me feel less scared, and able to go back to my room to sleep at night.  This was the beginning of him protecting and looking out for me.

Sure as we grew up as little boys do, there were tussles and fighting (never serious), the typical misadventures of two boys growing up in the 1990s, but it always came back to love and support.  He helped expose me to iconic cultural aspects that have become key to who I am as a person.  His interest in science fiction and mythical fantasy opened my eyes to wondrous possibilities of exploration and freedom.  His interest in the X-Men and other Marvel Comics helped me forge an idea of justice, right and wrong, and rejecting racial prejudice.  His devotion to Star Trek helped illustrate to me a future where humans can put aside racial and social fear, reach for the stars, and show the rest of the galaxy what cooperation, friendship, and generosity could look like.

In High School, Aaron introduced me to public speaking, Robert's Rules, and the "wonderful" world of politics through the school club of Model Congress.  Here, I learned from Aaron the rules of debate, honed critical thinking skills, and started to grow my own political consciousness.  While I formed my own political opinions, naturally, Aaron of course was a major influence.  I don't know how many other kids my age were making Bob Dole jokes!  Or better yet; even starting to think about and care about fellow citizens, their welfare, and protecting people's rights and beliefs while showing tolerance and excitement of the cultural infusion coming from the diversity that is core to our country's history and founding.

Aaron did not shy away from protecting others.  When he moved into his Co-Op in Great Neck, it quickly became apparent he was dealing with a corrupt superintendent and corrupt Executive Board.  Over the course of the next couple of years, Aaron canvassed the building, and helped run a campaign to save everyone in the building from the corruption, kick backs, and self-dealing that was occurring with the previous Board and Super.  In the end, Aaron saved the building, and even helped the building start repairing its finances after the previous Board.  Even when he had the opportunity to sell the co-op and leave, Aaron decided to stay and fight because it wouldn't be fair to the rest of the people in the building, and furthermore he couldn't stomach lying to the potential buyers about the situation in the building.  He had finally put the building's affairs in order before leaving and buying a house with his wife and baby boy.

Like many other great people, Aaron clearly had his demons.  It pains me beyond my core that such demons haunted him, that I didn't know, and that I couldn't be in a position to help him or give him some guidance to seek help.  It will now be one of the greatest regrets I have in my life.  I beg you for leniency and mercy for not just him; but for his family, our whole family, and others who rely on him.  Despite the

challenges ahead of him, Aaron has maintained gainful employment, and not just skirted by, he was also promoted and manages a small team of skilled Information Technology Specialists who help businesses troubleshoot advanced technical problems.  Aaron's wonderful wife Wei is here on an island, all of her family is back in Taiwan.  His son, whom Aaron dotes upon, is about to enter key developmental years of his life.  There are so many who would be punished alongside Aaron.  I love my brother Aaron, so I would be punished too.

If he is deemed a non violent threat, can he not continue the therapy and treatment that he has been seeking?  If there is a sickness that causes these demons to haunt Aaron, can he not continue to seek healing while also continuing to contribute so much to his family, his employment, and as a tax paying citizen?  He has been and continues to be imprisoned, in a sense, due to his house arrest.  Is justice not being served while he is being treated and still contributing to the community?

I beg of you to consider my letter.  I beg of you mercy, and to believe in the power of rehabilitation, healing, and the journey for repentance.  Thank you so much for taking the time to read my letter, and thank you for your service to the United States of America, Your Honor.

Sincerely and with the Warmest Regards,

Jeremy Michael Egelman

Honorable Judge Seybert
U.S. District Court Eastern District of New York
100 Federal Plaza Courtroom
1030 Central Islip, N.Y.11722

Your Honor,                                                                                    April 5, 2024

   My name is Elizabeth May, LCSW and I work with The New York Center for
Neuropsychology & Forensic Behavioral Science in Great Neck, N.Y. I have
been meeting with Mr. Egelman since December 6, 2022 weekly for mental health
counseling

   Aaron remains committed to attending and participating in his therapeutic sessions
each week. He has made progress during his mental health treatment process.
Mr. Egelman has used his sessions to explore and express his thoughts and feelings.
He is using Cognitive Behavioral Therapy, mindfulness, introspection and thankfulness
to help decrease anxiety symptoms.

   Mr. Egelman has shown love and dedicated for his young son and wife during treatment.
He has continued to raise his son to be a confident, well-educated and emotionally
sensitive child. The time Aaron plans to spend with his wife and child is constructive and
enriching for the family. Similarly, Mr. Egelman shares a good relationship with his
parents, brother and close friends. He appears to derive strong emotional support from
these relationships.

   I believe Aaron will continue to use self-calming strategies to lesson his feelings of
anxiety in his daily life. He will use introspection and foresight to make healthy choices
for himself and his family for the future.

Sincerely,

*Elizabeth May*

Elizabeth May, LCSW

April 14, 2024

Honorable Judge Joanna Seybert
United States District Court
Eastern District of New York
100 Federal Plaza, Courtroom 1030
Central Islip, New York 11722

To the Honorable Judge Seybert,

I am writing this letter in support of my friend, Aaron Egelman, and to speak to the content of his character as I know it to be.

I first met Aaron when we were in the same Kindergarten class. He was a shy child but also kind and caring. Our friendship has spanned the thirty plus years since then, at times more distant than others but in the recent past we have been closer than in prior years.

In the years between 11-15 we often spent time at hanging out at his parents' house listening to Adam Sandler comedy albums and playing video games. As we grew older and got into high school and college, we remained friendly but had different circles of friends. Although we didn't see each other as much, we still kept in touch and made time to see each other.

It was during one of these occasions, when we were 22 years old, a few of us had gotten together one night and I experienced the true character that Aaron possessed. We had a late night and were finishing it off with some friends at a local diner when he and I went to leave (he was driving me home) that I experienced a panic attack and fainted while walking and fell face first onto the pavement. Upon turning me over he realized that I had split my nose open and was bleeding, he immediately sprang to action and ran inside to have the manager call 911 and he proceeded to stay with my until the ambulance came. He then had the horrible job of calling my mother to inform her of what happened but he maintained his composure and phoned her so she could meet me at the hospital.

In the ensuing years we grew closer, frequently spending more time together. Aaron often organized group dinners with a few friends to make sure that we all maintained our ties. We attended each other's weddings and have spent time together with our families and children who are only a few months apart in age. Aaron has even had close relationships with my family over the years, even helping my brother access some security camera footage from an incident at the Bar/Restaurant that he owned.

The Aaron that I know is a dedicated family man, a loving husband and father, and a caring and compassionate friend. He has proven this to be the case time and again for as long as I have known him.

Sincerely,

**Dino Tsaousis**
168 N 2nd Street
Bethpage, NY 11714
(516) 860-7275
dino.tsaousis@gmail.com

37 Brompton Rd, Apt 6C
Great Neck, NY
April 18, 2024

Honorable Judge Joanna Seybert
United States District Court
Eastern District of New York
100 Federal Plaza, Courtroom 1030
Central Islip, New York 11722

To the Honorable Judge Seybert,

I am writing to you on behalf of Aaron Egelman, someone I have known as a neighbor
and friend for several years. Hopefully, the following will present a more complete
picture of the character of the individual before you.

Briefly about myself, my name is William Kazer. I am a former journalist who worked
overseas for more than three decades, mostly as a foreign correspondent and editor for
Reuters News and later as a senior editor at the Wall Street Journal.  I also was the
Asian managing editor of a financial news agency affiliated with the French news
service AFP. After my retirement in 2016, I moved into a co-op known as The Belgrave
in Great Neck, New York, where I met Aaron and his wife Wei. Aaron and I served on
the co-op's board of directors – he as president while I was board secretary.

As president of the board, Aaron helped put the co-op on a path to financial health,
more professional direction, and increased transparency, thereby reversing years of
chaotic management and fiscal neglect. This required a considerable amount of time
and energy on his part. Much of that effort was spent working with the co-op's managing
agent in supervising a long list of costly but necessary repair projects, addressing
personnel issues, and communicating with residents of the building, encouraging them
to take a more active role in building affairs. As with other board members, including
myself, Aaron received no financial compensation for this; his role was performed purely
out of community spirit.

Having worked alongside Aaron, I can attest to his integrity, a thoughtful approach to
problem-solving, and a deep consideration of the interests of other residents. This
combination resulted in his repeated re-election to the board.

Aaron also attended public meetings of the local government where policies were put in
place, sometimes having a significant impact on the living environment of residents of

the building. Aaron spent many hours attending such meetings to make sure that the voice of Belgrave residents was heard when policy decisions were made. As one example, a real estate investment company wanted to redevelop an adjacent building with minimal consideration of the effects on neighborhood congestion, noise and other forms of pollution, as well as the strain on resources of the local school system. Aaron worked with board members of other buildings in the neighborhood to ensure that if the development proceeded, the views of residents should at least be considered. Ultimately, the developer involved decided not to commit the necessary resources to meet these minimum standards.

I would also note that Aaron made this personal sacrifice while he was working full-time and starting a family.

Although Aaron later moved to another home, residents of the building still benefit from policies put in place during his time on the board.

As to Aaron's current situation, I can state that in conversations with me, Aaron has spoken of sincere regret for what now appears to be a life-changing mistake. He expressed deep contrition for behavior that his friends and associates would find to be totally out of character of the board president and neighbor we came to know.

I would also stress that this has taken a toll on him and his family. I hope that these effects as well as his past service to the community will be taken into consideration in the resolution of this matter.

Thank you.


Sincerely,


William Kazer

June 17, 2024

Honorable Judge Joanna Seybert
United States District Court
Eastern District of New York
100 Federal Plaza, Courtroom 1030
Central Islip, New York 11722

To the Honorable Judge Seybert,

I would like to submit this letter in support of my husband Aaron Egelman's character.

My name is Wei-ming Liu Egelman, and I am a fundraiser for an arts non-profit. I first met Aaron in October of 2009, after about a month of online exchanges. We dated for 14 months; broke up for 16 months; and reconnected in April 2012. We have been married since 2013, with our 11th anniversary coming up in November.

I was shocked, appalled and traumatized by the revelation of his case. His actions have profoundly and inexorably derailed the lives of myself and our son, not to mention his own. Early in the process of this case (August 2022, if I remember correctly), he expressed to me that as soon as he came to the stark realization of the harm that his actions caused the victims, he regretted ever considering it. I believe that he is truly repentant of his actions, and that his action in this case is a deviation from the person I know him to be, who is hardworking, thoughtful, and fundamentally a good person who strives to do the right thing and cause no harm to others. I would like to offer some examples to support this belief.

Aaron is a responsible, loving father to our son Joseph, who is four and a half years old. While Joseph and I do not currently live with Aaron due to his pretrial restrictions, we spend every single weekend with him at his parents' house, where he takes care of Joseph, engages him in fun and educational activities (like making volcanos in the back yard, building Lego structures and marble runs, and creating pre-bedtime games like treasure-hunting for toys with flashlights), and generally ensures that Joseph's childhood be as consistent and nurturing as possible despite our circumstances. Aaron was always an active partner in parenting Joseph even before all this, collaborating with me to research, create and carry out strategies for endless new issues and challenges that arise on the daily for new parents. Now he is keenly aware of the fact that he cannot share in the day-to-day responsibilities of parenting during the week, and is therefore very intentional in shouldering more of the childcare responsibilities on the weekend. He is gentle, firm and goofy with Joseph, and handles the occasional toddler tantrum with good cheer and care. I enclose a document that Joseph's pre-K teacher

had prepared with Joseph as a father's day present this year, as an example of Joseph's fondness for his father.

Aside from knowing Aaron as a life partner, I also worked with him for a year (2018 to 2019) on our building co-op board – I was the secretary of the board, while he served as board president from 2018 to 2022. He took on the responsibilities of this volunteer role with a fervor only matched by his hatred of the inefficiencies of the building's management, and basically created a part-time non-paying job for himself just so that he could make the building a better place to live. I made him track the weekly hours spent on preparing for and holding monthly board meetings, answering constituent calls, working with the building's management company to improve janitorial services, safety compliance and financial management, and solving emergent problems like leaking roofs and changing town ordinances – and it averaged about 10-15 hours per week for four years. One third of the building's residents were senior citizens, and Aaron devoted many of those hours in service of improving their lives. Due to his diligence and pre-planning, the average duration of monthly board meetings came down from over 4 hours to 1.5-2 hours, and the building's financial situation and sustainability vastly improved.

Aside from the above, Aaron is also a competent, compassionate and responsible employee who rose through the ranks during his 9-year tenure at his previous job with nary a complaint from any member of his community, and received two promotions within a year of being hired at his current position. He continues to receive commendations and positive feedback from clients, managers and direct reports alike. Because he works from home and sometimes over the weekend, I have repeatedly witnessed him guiding a new team member through problems with as gentle a hand as he does with our son.

Aaron Egelman is flawed. But other than this instance, from fifteen years of knowing him, I find him to be consistent in doing good and being kind. It is my assessment that having him in my son's life is still more beneficial to my son than otherwise. This is why I continue to associate with him despite the negative impact of his conviction on our lives. I hope you will consider our support of him in the sentencing.


Yours sincerely,

Wei-ming Liu Egelman

